UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CLINTON PRICE, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | No. 1:17-cv-706___-___ |
| vs. | ) ) | |
| UBER TECHNOLOGIES, INC., and RASIER, LLC, | ) ) ) | |
| Defendant. | ) ) ) | |

## CLASS ACTION COMPLAINT

Plaintiff, Clinton Price, on behalf of himself and all others similarly situated, alleges the following:

## INTRODUCTION

1. Plaintiff brings this action on behalf of current and former Uber Drivers ("Uber Drivers," "Drivers," or "drivers"), against Uber Technologies, Inc., and Rasier, LLC (collectively, "Uber" or "Defendants"), for damages and equitable relief arising from Uber's misclassification of Uber Drivers as independent contractors instead of employees.

2. Uber, a company valued at more than $60 billion, has taken, and continues to take, unfair advantage of financially struggling Uber Drivers by misclassifying them as "Independent Transportation Providers" (*i.e.*, independent contractors), when they are employees.

3. Plaintiff alleges that he and other Uber Drivers are employees, and, as employees, they are entitled to basic wage protections such as minimum wage, expense reimbursement (*e.g.*, gas, insurance, car payments, and maintenance), overtime pay, rest- and meal-breaks, and other benefits that attach to employees and that do not likewise attach to independent contractors. Uber misclassifies its drivers as independent contractors in order to evade these and other protections of federal and state law.

4. Uber also misrepresents to the public and to Uber Drivers how it compensates Drivers. Uber markets its rides as gratuity-included, but Uber does not actually designate any portion of the fare as a tip. Because passengers are misled into believing that a tip is already included in the fare, drivers are being cheated out of tips that passengers would otherwise leave.

## PARTIES

5. Clinton Price is a citizen of Indiana and a resident of Hamilton County. Plaintiff currently works for Uber as a Driver.

6. Uber Technologies, Inc. is a Delaware corporation headquartered at 1455 Market Street, San Francisco, California 94103. Uber is authorized to conduct business and does conduct business throughout the State of Indiana.

7. Rasier, LLC, a subsidiary of Uber and the equivalent of Uber for the purposes of this action, is a Delaware limited liability company headquartered at 1455 Market Street, San Francisco, California 94103. Rasier is a wholly owned subsidiary of Uber and is authorized to conduct business and does conduct business throughout the State of Indiana.

## JURISDICTION AND VENUE

8.　　This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under the Fair Labor Standards Act (29 U.S.C. § 201 *et seq*.).

9.　　This Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because (i) the aggregate value of the amount in controversy exceeds the sum or value of $5,000,000.00, exclusive of interest and costs; (ii) members of the Class are citizens of a state different from any defendant; and (iii) the Class consists of more than 100 members.

10.　　This Court also has supplemental jurisdiction under 28 U.S.C. § 1367 because the state law claims are so closely related to the claims over which the Court has original subject matter jurisdiction that the state law claims form part of the same case or controversy.

11.　　This Court has personal jurisdiction over Defendants because Defendants intentionally avail themselves of the rights and privileges of conducting business in the State of Indiana, have continuous and systematic contacts with the State of Indiana, and the injuries giving rise to the claims occurred in the State of Indiana.

12.　　Venue is proper in this District under 28 U.S.C. § 1391 because the events and conduct giving rise to the claims occurred in this District and because Defendants (i) are authorized to conduct business in this District and have intentionally availed themselves of the laws and markets within this District through the promotion, marketing, distribution, and sale of their service in this

District; (ii) do considerable business in this District; and (iii) are subject to personal jurisdiction in this District.

13.     Plaintiff alleges on information and belief that each Defendant acted in all manners relevant to this action as the agent of the other Defendant, carried out joint business plans and operations, and the acts and omissions of each Defendant are legally attributable to the other Defendant.

## FACTUAL ALLEGATIONS

### A.     Plaintiff Price

14.     Mr. Price began working for Uber as an Uber Driver in August of 2014. Mr. Price continues to work for Uber.

15.     Uber compensates its Drivers weekly.  Uber takes 20% of the total fares and the Driver receives the remaining 80%.  Because Plaintiff was improperly classified as an independent contractor, he has to pay all employment-related expenses, including gas, car repairs, lease payments, and insurance from his portion of the fare.

16.     Plaintiff's approximate weekly employment-related expenses are $102.57.

17.     In many pay periods, Mr. Price earned less than Indiana's minimum wage of $7.25/hour even before accounting for what he was required to pay, without reimbursement, for employment-related expenses. He also worked many periods where he was not paid overtime. Indeed, it appears that Mr. Price was never paid time-and-a-half for weeks when he worked more than 40 hours.

18.     During the week ending February 8, 2016, Mr. Price earned $316.37 and was logged on to the Uber application (*i.e.*, he was either in or next to his car, in his work clothes, on-call, waiting for Uber to send him a ride request) for 49.8 hours. This resulted in an effective hourly wage of $6.35, well below Indiana's and the Federal minimum wage. When expenses are taken into account, Mr. Price's hourly wage is significantly lower.

19.     During the week ending April 11, 2016, Mr. Price earned $220.00 and was logged on to the Uber application (*i.e.*, he was either in or next to his car, in his work clothes, on-call, waiting for Uber to send him a ride request) for 48.7 hours, earning an effective hourly wage of $4.52, well below Indiana's and the Federal minimum wage. When expenses are taken into account, Mr. Price's hourly wage is significantly lower.

20.     During the week ending December 26, 2016, Mr. Price earned $302.93 and was logged on to the Uber application (*i.e.*, he was either in or next to his car, in his work clothes, on-call, waiting for Uber to send him a ride request) for 77.4 hours, earning an effective hourly wage of $3.91. When expenses are taken into account, Mr. Price's hourly wage is significantly lower.

21.     During the week ending November 28, 2016, Mr. Price earned $244.87 and was logged on to the Uber application (*i.e.*, he was either in or next to his car, in his work clothes, on-call, waiting for Uber to send him a ride request) for 90.7 hours, earning an effective hourly wage of $2.70. When expenses are taken into account, Mr. Price's hourly wage is significantly lower.

22.     During the week ending November 21, 2016, Mr. Price earned $304.35 and was logged on to the Uber application (*i.e.*, he was either in or next to his car, in his work clothes, on-call, waiting for Uber to send him a ride request) for 96.2 hours, earning an effective hourly wage of $3.16. When expenses are taken into account, Mr. Price's hourly wage is significantly lower.

23.     During the week ending November 7, 2016, Mr. Price earned $390.67 and was logged on to the Uber application (*i.e.*, he was either in or next to his car, in his work clothes, on-call, waiting for Uber to send him a ride request) for 101.9 hours, earning an effective hourly wage of $3.83. When expenses are taken into account, Mr. Price's hourly wage is significantly lower.

24.     During the week ending October 31, 2016, Mr. Price earned $455.94 and was logged on to the Uber application (*i.e.*, he was either in or next to his car, in his work clothes, on-call, waiting for Uber to send him a ride request) for 79.3 hours, earning an effective hourly wage of $5.74. When expenses are taken into account, Mr. Price's hourly wage is significantly lower.

25.     Mr. Price's effective hourly wage was not at any time offset by expense reimbursement. Although it is currently unknown to Plaintiff as it pertains to Indiana, Uber has saved as much as $730,000,000 since 2009 by not reimbursing on-the-job expenses in California and Massachusetts.

26.     On December 11, 2015, Defendants issued its most recent and operative driver contract (the "Agreement"). The Agreement requires Drivers to opt

out of the arbitration provision within 30 days.  On December 11, 2015, Mr. Price timely opted out of the arbitration.

**B.    Uber Treats Drivers Like Employees**

27.    Defendants employed Plaintiff and members of the Class and exercised complete control over their wages, their hours, and their working conditions.

28.    Uber controls the manner, methods, and means of Uber Drivers' provision of transportation services for Uber. Uber retains all necessary control over Plaintiff's and Uber Drivers' performance.

29.    Indeed, Defendants regulate every aspect of Uber Drivers' job performance.

30.    As with other employers, Defendants required Plaintiff and Uber Drivers to submit to background checks and to disclose banking information and residence, as well as social security numbers, prior to being hired.

31.    Uber required Plaintiff and Uber Drivers to register their cars with Uber and that the vehicles cannot be more than ten years old.

32.    Uber Drivers do not pay Uber to use Uber's intellectual property, the mobile application. Rather, Uber compensates Uber Drivers for transporting passengers, based upon the employment arrangement that Uber unilaterally imposed upon its Drivers, as with any employment-based business model.

33.    Uber Drivers are not engaged in a business distinct from Uber's business.  Uber sells rides. Drivers provide the means to fulfill ride requests.

Through the application, Uber controls and directly manages Uber's entire transportation service.

34.     Plaintiff's and Uber Drivers' ability to earn income depends solely on Uber and not in any way on an Uber Driver's particular skill or acumen or on any managerial or other discretionary job skill.

35.     Uber Drivers must strictly follow a litany of very specific company imposed regulations that govern all aspects of a Drivers' performance, yet Uber enjoys the benefits of misclassifying Uber Drivers as independent contractors.

36.     Uber's rules and regulations for Uber Drivers govern almost every facet of the job, and Drivers have little opportunity to deviate from Uber's proscribed means and methods of doing business.

37.     Uber Drivers must adhere closely to Uber's parameters in order to be eligible to drive in the first place. Uber pushes potential Uber Drivers to purchase or lease specific types of vehicles.

38.     To avoid termination, all Uber Drivers must maintain these vehicles and achieve a certain star rating in a system devised and monitored closely by Uber.

39.     From fares and fees, to what to wear and what route to take, in addition to subjecting its employees to constant monitoring by GPS, Uber directs and sets the terms and conditions of Uber Drivers' work.

40.     Uber is deeply involved in marketing its transportation services, qualifying and selecting Uber Drivers, regulating and monitoring their performance

(including disciplining or terminating those who fail to meet its employment standards, or for any other reason), and setting fares. The Drivers do none of these things, which one would expect if they were truly independent from Uber.

41.     Uber exercises absolute control over the qualification and selection of its Drivers. Before driving for Uber, applicants must complete Uber's application process, including background checks.

42.     Uber controls all work aspects of its Uber Drivers including Plaintiff, concerning the manner, methods, and means of their provision of transportation services for Uber. For example, Plaintiff was instructed on the Uber requirements for picking up customers. Uber retains all necessary control over Plaintiff's and Uber Drivers' performance.

43.     Uber controls the terms and conditions of employment from what to wear to what route to take, to setting customer fares and Uber's fee. Uber has the authority to hire, fire, and discipline Uber Drivers.

44.     Uber's control begins through a series of communications given by Uber to Uber Drivers when they sign up to drive with Uber or to affiliate their vehicles with the company, including instructional tips, videos, a handbook, and in-person trainings that have the force of a code of conduct/employee rules.

45.     Where the prescribed conduct is not followed, Uber Drivers are subject to poor ratings, decreased access to dispatches, decreased access to the most profitable class of dispatches, and termination or "deactivation" in Uber's parlance.

46. Uber mandates each Driver view various "on-boarding instructional" videos in order to drive for Uber.

47. These videos instruct Uber Drivers on how to interact with customers in order to provide them with the desired Uber experience.

48. Uber directs Uber Drivers' grooming, dress, and personal hygiene.

49. Uber seeks to control the type of conversations Uber Drivers have with the customers, recommending they comment on how much they like working for Uber and instructing them to encourage the customer to recommend Uber to friends.

50. Uber Drivers received handbooks that give detailed instructions on how to operate the Uber app, how long to wait for passengers, and exactly how to respond to passengers who attempt to offer cash tips.

51. The handbook gives detailed directions on exactly when an Uber Driver can start charging for wait time. Drivers are instructed that, if the customer answers a phone call and requests the Driver to wait longer than ten minutes, the Driver should ask if the customer agrees to pay for wait time and start the in-app meter at the ten-minute point.

52. Uber Drivers are rated on a star system. The handbook details a list of behaviors that lead to 1-star ratings (worst) and 5-star ratings (best), respectively. Actions that lead to 1-star ratings include calling a rider unnecessarily, asking for 5-star ratings, asking for tips, taking an inefficient route, or accepting cash. Actions that lead to 5-star ratings include asking if the passenger has a preferred radio

station, communicating throughout the trip, always asking for the passenger's preferred route, and politely greeting the passenger and asking their name.

53.     Although, in conveying the above rules, Uber has, more recently, labeled its direction to Uber Drivers as "tips" and "suggestions," this choice of words makes no practical difference to Uber Drivers because when these expectations are not met, Uber may discipline Drivers and even terminate their employment completely.

54.     Uber Drivers also received consistent instruction throughout the term of their employment by way of mass e-mails sent by Uber to all Uber Drivers.

55.     Uber maintains a substantial interest not only in the behavior of Uber Drivers, but also in the presentation and mechanical upkeep of their cars, including the type of vehicle and level of service.

56.     In order to drive for Uber, Uber Drivers must purchase or lease a vehicle that meets Uber's specifications.

57.     Uber's control extends to its dispatch of fares, which it does in order of preference based on Uber Drivers' acceptance rate and star rating, in addition to a Driver's proximity to the customer.

58.     Uber's control extends even to the routes taken by Uber Drivers. Uber unilaterally decides what route a Driver should take or, after the fact, should have taken, and will reduce a Driver's pay accordingly, without first consulting the Driver, or even examining the surrounding traffic conditions.

59.     In pursuit of maintaining consistent 5-star service, Uber reserves the right to deactivate Uber Drivers based on passenger ratings and indeed encourages passengers to offer feedback on Uber Drivers to create a more uniform experience.

60.     In addition to deactivating for failing to accept 90% of dispatches or failing to maintain a 4.5-star rating, Uber's practice is to deactivate Uber Drivers in the bottom 5% of its ratings, regardless of whether Uber Drivers' activity has prompted any specific complaints.

61.     Uber Drivers receive 15 or more requests per day through the Uber mobile application.  Once the request is received, Plaintiff has an option to either "accept" or "reject" the request and must do so immediately.  Accepting less than the 90% threshold results in Uber deactivating Uber Drivers' accounts, and therefore, preventing the drivers from receiving any rider requests.



62.     Uber monitors Uber Drivers to ensure compliance with Uber's quality control standards.  Uber requires all Drivers, including Plaintiff, to maintain an average customer star evaluation of at least 4.5 out of a possible 5 stars. Requirements on how to improve a star rating are given to Uber Drivers that fall below this average in any given week.  If an Uber Driver fails to maintain an average customer rating of 4.5, Uber gives the Driver 30 days to raise her rating within the required threshold. If the Uber Driver does not do so, Uber terminates that Driver's employment with Uber by deactivating the Driver's ability to use the application to pick up customers, and thus to continue to work. Uber Drivers are also effectively fired from Uber's employment if they do not log a certain number of hours driving.



63. Uber directed Plaintiff to log on to the application and go on-duty only when he is in his vehicle and ready, willing, and able to accept an Uber dispatch.

64. While logged on to the Uber application and waiting for a ride request (but before receiving a request), Plaintiff was and is covered by Defendants' primary automobile liability insurance.

65. Because Uber told Plaintiff to remain in his car while logged on to the application, he could receive 15 or more ride requests per day, and failing to accept 90% of ride requests results in deactivation and/or termination, Plaintiff was unable to effectively use waiting time while logged on to the application for his own purposes. Periods of inactivity are unpredictable (*i.e.*, an assignment could come at any moment) and usually of short duration. Drivers must be in position to respond quickly to requests. If they don't, Uber could deactivate or even fire them.

66. As a result, Uber Drivers are forced to remain in their vehicles at all times while logged on to the application and must also remain in their work clothes so they are ready to immediately respond when a ride request comes in. They must also keep an eye on their mobile phone to ensure that they are not missing a request. Under such conditions, Uber Drivers cannot use waiting time effectively for their own purposes.

67. Uber Drivers' wait time while logged on to the application is primarily spent for Uber's benefit—so that Uber can provide speedy service for passengers. Moreover, when a potential passenger logs in to the app they are shown a map with all the logged in Uber drivers in their vicinity. When Plaintiff is logged in to the

Uber app, Uber presents to customers that he is available to drive immediately. Not only does this practice benefit Uber, by presenting to passengers that there are cars available, it also prevents Plaintiff from performing any other activities while logged in, as he expected to be able to pick up passengers immediately.

68. That is why Uber punishes drivers who fail to immediately respond to driver requests and those drivers who do not accept at least 90% of such requests. By rejecting a ride request, an Uber Driver runs the substantial risk of being locked out of the Uber app and terminated. Uber reinforces this message frequently: Uber Drivers receive consistent instruction by way of mass e-mails reminding them that not accepting trips would lead to being locked out of the app.

69. Since it is impossible to predict when it would be necessary for an Uber Driver to resume his or her work duties, there is no way Uber could definitely inform the Driver in advance that he or she could leave the job and not return until a definitely specified hour had arrived. This makes it impossible for Uber Drivers to perform a second job or do personal activities during the waiting time while they are logged on to the Uber application.

70. While logged in, Drivers must remain free and available in case a ride request comes in, in order to avoid needing to reject a request and the negative consequences that may follow.

71. The restrictions imposed by Uber while Plaintiff was logged on to the application are so onerous as to prevent him from effectively using the time for personal pursuits. In addition to being tied to his car, ride requests come in so

unpredictably and frequently that Plaintiff cannot make effective use of the time spent while logged on to the application. Defendants' requirements are simply too cumbersome so that, while Plaintiff is logged on to the application, his ability to do personal activities is usually outright prevented and is at all times at least seriously inhibited.

72. The conditions placed on Plaintiff's activities were so restrictive—*e.g.*, Uber required him to be in his car and ready to accept a ride request—that he could not use time logged on to the app effectively for personal pursuits. Indeed, Plaintiff kept a container in his car that he used for urinating so that he would not have to log off of the application to use the restroom.

73. While logged on to the application, Plaintiff had to remain vigilant and continually monitor his phone (Plaintiff faced the prospect of deactivation for missing requests), which is cumbersome, and remain alert because a request could come any second.

74. Being logged on to the app is indispensable to the principal activity of work. Without being logged on, there's no way to get a ride request and Uber cannot service its clients.

75. When logged on to the app and confined to his car, Plaintiff was unable to engage in personal activities.

76. Having Plaintiff and Class members logged on to the app and ready to go provided Uber with flexibility in assigning rides and ensured that it could

quickly respond to passenger requests, thus furthering Uber's business objectives of providing speedy service (an integral and indispensable part of Uber's business).

77.     Numerous Class members, including people Plaintiff knows, have been punished for not meeting Uber's 90% threshold.

78.     All aspects of the business affecting the bottom line are set by Uber, in its sole discretion.

79.     When the passenger completes the trip, Uber's control extends to all aspects of the financial transaction.

80.     Uber unilaterally sets the fares—with no negotiation or input from Plaintiff— for all rides, and Uber Drivers are required to charge the cost determined solely by Uber.  Uber bills customers for the entire amount before remitting payment to Uber Drivers.  Uber Drivers are paid by Uber.

81.     Uber claims a proprietary interest in its passengers, which further demonstrates that Uber acts as much more than an intermediary between passengers and Drivers. For instance, Uber prohibits its Drivers from answering rider queries about booking future rides outside the Uber application or from otherwise soliciting Uber riders.

82.     Uber Drivers are denied all independent judgment or control about what fare to set to meet their bottom line.

83.     Uber collects all monies from passengers and disburses such monies according to its own accounting procedures and policies.

84.     Just as Uber's control of the bottom line is inconsistent with Uber Drivers' operation of an independent business, so too is Uber's requirement that customer goodwill flow to it, not to Drivers.

85.     The amount of Drivers' earnings, like other employees, depends solely on the amount of time that they work and the number of rides that Uber dispatches to them during that time.

86.     Uber Drivers require no special skill or independent initiative to perform their work. Indeed, Uber's recruitment platform to potential Drivers is that anyone with a car can become an Uber Driver.

87.     Uber does not require a specially-skilled workforce, as it can better impose its branded service through extensive rules and ceaseless monitoring and supervision.

88.     Uber's app maintains constant GPS contact with Uber Drivers. Indeed, this constant tracking is required in order for Uber to match potential customers with its Drivers based on proximity.

89.     Uber Drivers' contracts are indefinite and not renewed on a job-to-job basis.

90.     Uber Drivers' managerial skills do not affect their opportunity for profit or loss.

91.     In addition to the above indicia of an employment relationship between Uber and Drivers, including Plaintiff, Uber's pay structure also demonstrates the existence of an employment relationship.

92.     Uber is deeply involved in marketing its transportation services, qualifying and selecting Uber Drivers, regulating and monitoring their performance (including disciplining or terminating those who fail to meet its employment standards), and fare setting.

93.     Uber exercises absolute control over the qualification and selection of its Drivers.  Before driving for Uber, applicants must complete Uber's application process, including background checks.

94.     Uber claims a proprietary interest in its passengers, which further demonstrates that Uber acts as much more than an intermediary between passengers and Drivers.  For instance, Uber prohibits its Drivers from answering rider queries about booking future rides outside the Uber application, or from otherwise soliciting Uber riders.

95.     In summary, Uber sets fare prices without driver input and drivers may not negotiate fares. Uber retains control over customer contact information. Uber's business model depends upon having a large pool of non-professional drivers. There are no apparent specialized skills needed to drive for Uber. Uber retains the right to terminate drivers at will. Uber also controls various aspects of the manner and means by which drivers may offer rides through the Uber App. Among these, Uber requires drivers to accept virtually all ride requests when logged into the App or face potential discipline.

96.     Uber requires drivers to dress professionally, send the customer who has ordered a ride a text message when the driver is 1-2 minutes away from the

pickup location, keep their radios either off or on soft jazz or NPR, open the door for the customer, and pick up the customer on the correct side of the street where the customer is standing.

97.     Uber controls the rate of refusal of ride requests, the timeliness of the drivers' responses to requests, the display on vehicles of its logo, the frequency with which drivers may contact passengers, the drivers' interactions with passengers (including how they accept tips and collect fares), and the quality of drivers via its rating system.

98.     Drivers must follow a litany of detailed requirements that Uber imposes on them and they are graded, and are subject to termination, based on their failure to adhere to these requirements (such as rules regarding their conduct with customers, the cleanliness of their vehicles, their timeliness in picking up customers and taking them to their destination, what they are allowed to say to customers, etc.).

99.     Defendants vet prospective drivers, who must provide their personal banking and residence information, as well as their Social Security number. Drivers cannot use Defendants' application unless they pass Defendants' background and DMV checks. Defendants control the tools the drivers use. For example, drivers must register their cars with Defendants, and their cars can be no more than ten years old. Defendants monitor Uber Drivers' approval ratings and terminate the access to the application if the rating falls below a specific level (4.5 stars). Drivers do not pay Defendants to use their intellectual property. Defendants pay their

drivers a non-negotiable service fee based on the fares they generate. If a passenger

cancels a trip request after the driver has accepted it, and the driver has appeared

at the pick-up location, the driver is not guaranteed a cancellation fee. Defendants

alone have the discretion to negotiate this fee with the passenger. Plaintiff's car and

his labor were his only assets. Plaintiff's work did not entail any managerial skills

that could affect profit or loss. Aside from his car, Plaintiff had no investment in the

business. Defendants provided the iPhone application, which was essential to the

work. But for Defendants' intellectual property, Plaintiff would not have been able

to perform the work.

100.    As a result of the intentional misclassification of its employees, Uber

has not provided Plaintiff and other Uber Driver employees with itemized wage

statements, minimum wages, overtime, and reimbursement for necessary expenses

(for example, gas, tolls, car repairs, and lease payments). Also resulting from this

misclassification is Uber's failure to keep accurate payroll records evidencing

Plaintiff's and other Drivers' hours worked and wages paid and gratuities retained.

Uber likewise does not pay into any insurance fund, including Social Security,

disability, or unemployment insurance.

**C.    Plaintiff and the Other Uber Drivers Qualify as Employees
Under the FLSA's Six-Factor Test**

101.    **Factor 1: The degree of control exercised by the alleged**

**employer.** As provided above, Uber exercises a significant degree of control over

the Plaintiff and other Uber Drivers' actual work. Uber unilaterally dictates the

fare to be charged, a percentage of which is paid to the driver. Uber monitors the

21

performance of Drivers and may discipline or terminate those who do not perform to Uber's standards. Uber may restrict a driver's access to its smartphone application if the driver fails to complete a requisite number of trips within a defined period. Uber instructs drivers as to their conduct, personal appearance, and methods for carrying out services. Uber prescribes qualifications for its drivers and selects them through a screening process that includes a background check, motor vehicle records check, and vehicle inspection.

102. **Factor 2: The extent of the relative investments of the worker and the alleged employer.** An Uber Driver's investment is largely restricted to the use of a personal vehicle. This includes fuel, maintenance, upkeep, and insurance costs. Sometimes, driver investment includes a deposit for the iPhone Uber provides for access to its application. But Uber provides the entire apparatus that makes the service possible. This includes, but is not limited to, the software application itself, marketing, finance and accounting systems, and management of operations. Plaintiff and other Uber Drivers' investment is negligible compared to that of Uber's multi-billion-dollar infrastructure.

103. **Factor 3: The degree to which the worker's opportunity for profit and loss is determined by the alleged employer.** Plaintiff and other Uber Drivers do not exercise managerial functions that affect the opportunity for profit or loss. Uber sets the fare without input from drivers. Plaintiff's and other Uber Drivers' ability to earn additional income is related only to the number of rides they provide through Uber. In fact, Uber prohibits workers from answering rider

questions about booking future rides outside the Uber application or in any other way soliciting future rides from Uber riders.

104. **Factor 4: The skill and initiative required in performing the job.** Plaintiff and other Uber Drivers do not exercise managerial and business-like skills or initiative that would indicate they are operating independent businesses. Rather, they are dependent entirely upon Uber's application in order to perform any work.

105. **Factor 5: The permanency of the relationship.** Uber does not engage Plaintiff and other Uber Drivers to perform services for a fixed period of time or on a project or contract basis. As long as the drivers satisfy Uber's standards they may work indefinitely. The relationship may, therefore, be expected to last for a long period of time.

106. **Factor 6: The extent to which the work performed by the worker is an integral part of the alleged employer's business.** Uber provides transportation services to its customers, services it cannot provide without Plaintiff and other Uber Drivers. As such, the driver's work is not only integral but a necessary part of Uber's business.

## D.      Uber Deceives Drivers and Passengers

107. In August 2014, Plaintiff saw a communication from Uber. The communication said he would make $2,000 a week driving for Uber.

108. Plaintiff relied on this representation in deciding to sign up for and drive for Uber. Indeed, since Uber had amassed a significant amount of data on the

amount of money drivers would make, Plaintiff assumed that Uber wasn't lying to him and that Uber could be trusted.

109. But Plaintiff never made the money he was promised.

110. Lying to drivers about how much money they would make appears to have been a widespread practice for Uber. Indeed, Uber just entered into a "Stipulated Order for Permanent Injunction and Monetary Judgment," attached as **Exhibit 1**, in an action brought by the Federal Trade Commission for the same conduct Plaintiff complains about. Uber agreed to pay $20,000,000 and to not make any more misrepresentations regarding the income a driver is likely to earn.

111. Uber also markets its rides in a manner that causes a reasonable and justified belief in its riders that its Drivers are gratuity-compensated, and that, as such, there's no need to tip.

112. Uber misleadingly states that gratuity is included in the total cost of the fare.

113. For example, in 2015, Uber sent promotion emails to customers, declaring that "payment is automatically charged to a credit card on file, with tip included."

114. Uber has advertised to customers that gratuity is included in the cost of its car service but Uber Drivers do not receive any such gratuity. By informing customers that gratuity is included in the cost of its service, and that there is no need to tip the drivers, but then not remitting any gratuity to drivers, Uber Drivers

have been deprived of payments to which they are entitled, and to which reasonable customers would have expected them to receive.

115.    Customers reasonably expect that payments described as tips will be paid directly to the workers providing services and not retained by the business.

116.    Uber intentionally misrepresented that gratuity was included in the cost of fares and instructed passengers not to leave a tip in addition to the amount of the fare.

117.    As a result, Plaintiff and Uber Drivers have sustained damages in the amount of gratuity that they would have received but for Uber's misrepresentation.

118.    In addition to its deceptive and unlawful practice regarding tipping, despite the control that it exercises over Uber Drivers, Uber uniformly misclassifies Uber Drivers, including Plaintiff, as independent contractors when they should be classified as employees.

119.    As a result of the intentional misclassification of its employees, Uber failed to provide Plaintiff and other similarly aggrieved driver employees with itemized wage statements, minimum wages, overtime, and reimbursement for necessary expenses (*e.g.*, gas, tolls, car repairs, and lease payments).  Uber also failed to keep accurate payroll records evidencing Plaintiff's and other drivers' hours worked and wages paid and unlawfully interfered in drivers' ability to collect tips. Uber also fails to pay into any insurance fund, including Social Security, disability, and unemployment insurance.

# CLASS ACTION ALLEGATIONS

120.    Plaintiff commences this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, including Rule 23(b)(3), on behalf of the following Classes:

> The "Indiana Common-Law Class": All natural persons who have worked, or who continue to work, as an Uber Driver within the State of Indiana for the six years prior to the filing of the complaint in this action and who have either opted out of arbitration or are bound to an agreement that allows the Court to evaluate the enforceability of the class action waiver.

> The "Indiana Employment Class": All natural persons who have worked, or who continue to work, as an Uber Driver within the State of Indiana for the two years prior to the filing of the complaint in this action and who have either opted out of arbitration or are bound to an agreement that allows the Court to evaluate the enforceability of the class action waiver.

121.    Subject to additional information obtained through further investigation and discovery, the foregoing definitions of the Classes may be expanded or narrowed by amendment or amended complaint. Excluded from the Classes are Defendants and its affiliates, parents, subsidiaries, employees, officers, agents, and directors; government entities or agencies, their affiliates, employees, officers, agents, and directors in their governmental capacities; any judicial officer presiding over this matter and the members of their immediate families and judicial staff; and class counsel.

122.    **Numerosity**: The proposed Classes are so numerous that joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the court. The precise number of such persons is unknown

26

because the data required to calculate that number is presently within the sole possession, custody, or control of Defendants. Upon information and belief, there are thousands of Uber Drivers in the State of Indiana, and thus in the proposed Class.

123. **Commonality**: There are questions of law and fact common to the Indiana Common-Law Class that predominate over any questions affecting only individual Class members, including but not limited to:

a. Whether Defendants made misrepresentations to drivers regarding the amount of money they would make;

b. Whether Defendants willfully or negligently deceived drivers regarding the amount of money they would make;

c. Whether Defendants made misrepresentations to passengers regarding the inclusion of gratuities in the fare;

d. Whether Defendants tortiously interfered with Class members' collection of gratuities from passengers;

e. The proper measure of damages recoverable by Class members; and

f. Additional common questions of law and fact as developed during the discovery phase of this litigation.

124. **Commonality**: There are questions of law and fact common to the Indiana Employment Class that predominate over any questions affecting only individual Class members, including but not limited to:

a. The policies, programs, practices, procedures, and protocols of Defendants concerning or relating to the Class members' actual and substantive work and job duties, their titles notwithstanding;

b. Whether Defendants are and were subject to minimum wage and overtime requirements;

c. Whether Defendants improperly classified Class members as independent contractors rather than employees;

d. Whether Class members have been required to pay the expenses of their employment with Uber and whether Uber is required to compensate members of the Class for those expenses;

e. The proper measure of damages and the proper measure of restitution recoverable by Class members; and

f. Additional common questions of law and fact as developed during the discovery phase of this litigation.

125. **Typicality**: Plaintiff's claims are typical of the claims of the Classes, as such claims could be alleged by any member of the Classes, and the relief Plaintiff seeks is typical of the relief that Class members seek. All of the Class members were subject to the same pattern and practice of Defendants as alleged. Defendants' corporate-wide policies and practices affected all Class members similarly, and Defendants benefited from the same type of unfair and/or wrongful acts as to each Class member. Plaintiff and other Class members sustained similar

losses, injuries, and damages arising from the same unlawful policies, practices, and procedures of the Defendants.

126. **Adequacy of Representation:** Plaintiff is able to fairly and adequately protect the interests of the Classes and have no interests adverse to the Classes. At all relevant times, Plaintiff and Class members are and have been similarly situated, have had substantially similar job requirements and pay provisions, and are and have been subjected to Defendants' decisions, policies, plans, programs, practices, procedures, protocols, routines, and rules, all culminating in willful wage and hour violations.

127. **Predominance:** Questions of law and fact common to members of the Classes predominate over any questions which may affect only individual members.

128. **Superiority**: Prosecution of separate actions by individual members of the Classes would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the Classes, establishing incompatible standards of conduct for Defendants and resulting in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. The losses, injuries, and damages are small as relevant to a class action analysis, such that without class treatment, individual action by each Class member would be cost-prohibitive.

129. The Class members are also readily ascertainable. For purposes of notice and other purposes related to this action, their names and addresses are

known to Defendants. The number and identity of the Class members are determinable from the records of Defendants.

130. The representatives and their chosen attorneys are familiar with the subject matter of the lawsuit and have full knowledge of the allegations contained in this complaint so as to be able to assist in its prosecution. In addition, the representative's attorneys are competent in the relevant areas of the law and have sufficient experience to vigorously represent the Class. Furthermore, the resources available to counsel ensure that the litigation will not be hampered by a lack of financial capacity. Plaintiff's attorneys have sufficient financial resources and are willing to absorb the costs of the litigation.

## COLLECTIVE ACTION ALLEGATIONS

131. Plaintiff brings Count VI of this action on behalf of himself and all other similarly situated individuals (the "Collective") pursuant to the FLSA.

132. The proposed Collective is defined as follows:

> All natural persons who have worked or who continue to work as an Uber Driver anywhere in the United States within the past three years and who have either opted out of arbitration or are bound to a driver agreement that allows the Court to evaluate the enforceability of the class action waiver.

133. Excluded from the Collective are Defendants and their affiliates, parents, subsidiaries, employees, officers, agents, and directors; government entities or agencies, its affiliates, employees, officers, agents, and directors in their governmental capacities; any judicial officer presiding over this matter and the members of their immediate families and judicial staff; and class counsel.

134.     Plaintiff reserves the right to amend or modify the Collective definition in connection with a motion for collective action certification or as warranted by discovery.

135.     Questions of law and fact common to the Collective as a whole include, but are not limited to, the following:

a.     Whether Plaintiff and the Collective were improperly classified as independent contractors;

b.     Whether Defendants failed and continue to fail to pay overtime compensation in violation of the FLSA, 29 U.S.C. § 201 *et seq.*;

c.     Whether Defendants' failure to pay overtime to Plaintiff and the Collective was willful within the meaning of the FLSA;

d.     Whether Defendants failed and continue to fail to pay minimum wage in violation of the FLSA, 29 U.S.C. § 201 *et seq.*;

e.     Whether Defendants' failure to pay minimum wage to Plaintiff and the Collective was willful within the meaning of the FLSA;

f.     Whether Defendants failed to pay "free and clear" wages in violation of the FLSA, 29 U.S.C. § 201 *et seq.*;

g.     Whether Defendants failed and continue to fail to reimburse employees for necessary expenses in violation of the FLSA; and

h.     Whether Defendants failed and continue to fail to make and maintain accurate records of actual time worked by Plaintiff and the Collective in violation of the FLSA, 29 U.S.C. § 201 *et seq.*

136.    The claim for violation of the FLSA is brought pursuant to 29 U.S.C.

§ 216(b) for all claims asserted by Plaintiff on behalf of himself and the Collective

because Plaintiff's claims are similar to the claims of the members of the Collective.

137.    Plaintiff and the Collective are similarly situated, have substantially

similar contract agreements and pay provisions, and are subject to Defendants'

common practice, policy, or plan of failing to keep accurate records and failing to

pay minimum wage and overtime in violation of the FLSA.

138.    Plaintiff will fairly and adequately represent and protect the interests

of the members of the Collective. Plaintiff has retained counsel competent and

experienced in complex class actions, FLSA, labor law, and employment law

litigation.

139.    The names and addresses of the Collective members are available from

Defendants.

## CAUSES OF ACTION

### COUNT 1
### VIOLATIONS OF THE FAIR LABOR STANDARDS ACT
### (on behalf of the FLSA Collective)

140.    Plaintiff, on behalf of himself and the proposed Collective, repeats and

realleges all preceding paragraphs as if fully set forth herein.

141.    Defendants misclassified Plaintiff and the Collective as independent

contractors.

142.    Plaintiff and the Collective are non-exempt employees, as defined by the FLSA. Plaintiff has consented in writing to be a part of this action pursuant to 29 U.S.C. § 216(b).

143.    Defendants are enterprises "engaged in commerce" as defined in 29 U.S.C. § 203(s)(1)(A)(ii), because they had gross operating revenues in excess of $500,000.00.

144.    Defendants are enterprises "engaged in commerce" because they provide on-demand car services, which require the use of interstate channels, namely roads and highways.

145.    Defendants have required Plaintiff and other Uber Drivers, as part of their employment, to work without receiving minimum wage, violating 29 U.S.C. § 206(a), which provides in pertinent part, "[e]very employer shall pay to each of his employees who in any work week is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the [minimum wage]."

146.    Defendants have required Plaintiff and Uber Drivers, as part of their employment, to work without additional compensation, such as overtime pay, in excess of the forty hours per week maximum, violating 29 U.S.C. § 207(a)(1), which provides the following: "Except as otherwise provided in this section, no employer shall employ any of his employees for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours

above specified at a rate which is not less than one and one-half times the regular rate at which he is employed."

147.    Defendants have required Plaintiff and other Uber Drivers, as part of their employment, to work without compensation for all hours worked, to work beyond forty hours per week without the payment of overtime compensation for such hours, and/or to work at a wage less than the minimum wage, pursuant to, *inter alia*, 29 U.S.C. §§ 206 and 207(a)(1).

148.    Plaintiff's FLSA claims are also brought for off-the-clock and minimum wage violations. Indeed, in the performance of their duties for Defendants, Plaintiff and other Uber Drivers typically worked more than forty hours per week, yet did not receive straight or overtime compensation for the work, labor, and services he provided to Defendants, as required by the FLSA. The precise number of unpaid overtime hours will be proven at trial.

149.    Defendants did not pay "free and clear" wages. "Wages" cannot be considered to have been paid by the employer and received by the employee unless they are paid finally and unconditionally or "free and clear." The wage requirements of the FLSA will not be met where the employee "kicks-back" directly or indirectly to the employer or to another person for the employer's benefit the whole or part of the wage delivered to the employee. This is true whether the "kick-back" is made in cash or in other than cash. Defendants' requirement that Plaintiff and other Uber Drivers provide their own vehicles and pay other work-related expenses violates the FLSA in any workweek—such as those described above—when the cost of the

vehicles cuts into the minimum or overtime wages required to be paid him under the FLSA.

150.    Defendants have failed to make, keep, and preserve records with respect to each of the Plaintiff and the Collective he seeks to represent, which are necessary to determine the wages, hours, and other conditions and practices of employment in violation of the FLSA, 29 U.S.C. §§ *201 et. seq.*, including 29 U.S.C. § 211(c) and § 215(a).

151.    Defendants' violations of the FLSA were willful and are ongoing. Defendants knew exactly how long Plaintiff was working. As a result of the foregoing, Plaintiff seeks judgment against Defendants for all unpaid wages, including overtime and minimum wages, together with an award of liquidated damages, and costs, interests, and reasonable attorneys' fees, pursuant to, *inter alia*, 29 U.S.C. § 216(b).

## COUNT 2
## VIOLATIONS OF INDIANA WAGE & HOUR LAW
### (on behalf of the Indiana Employment Class)

152.    Plaintiff, on behalf of himself and the Indiana Employment Class, repeats and realleges all preceding paragraphs as if fully set forth below.

153.    Uber's treatment of Plaintiff and the Class, and the amount of control exercised by Uber over Plaintiff and the Class, indicates that Plaintiff is an employee and not an independent contractors.

154. Uber has not acted in good faith in failing to treat and pay drivers as employees rather than as independent contractors.

155. Uber has violated Indiana wage and hour laws by failing to remit minimum wage to drivers in violation of Indiana Code § 22-2-2-4.

156. Uber has violated Indiana wage and hour laws by failing to remit overtime pay to drivers in violation of Indiana Code § 22-2-2-4(j).

157. As a result of Uber's conduct, members of the Indiana Wage Payment Statute Sub-Class are entitled to recover under Indiana Code §§ 22-2-2-9 and 22-2-5-2 for all unpaid wages and attorneys' fees and costs, plus liquidated damages equal to two times the amount of unpaid wages due.

### COUNT 3
### TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS AND PROSPECTIVE ECONOMIC ADVANTAGE
### (on behalf of the Indiana Common-Law Class)

158. Plaintiff, on behalf of himself and the Class, repeats and realleges all preceding paragraphs as if fully set forth below.

159. Plaintiff has a prospective business relationship with an identifiable class of third persons: passengers.

160. Uber knows about this relationship because Uber is the one who assigns customers to Plaintiff.

161. Uber interfered with the continuing business relationship between Drivers and their passengers—a separate relationship from that between either Uber and its Drivers or Uber and its riders, and one to which Uber is not a party—

whereby passengers would have customarily paid Drivers, including Plaintiff, a gratuity above and beyond the fare set by Uber absent Uber's interference.

162. Uber employed improper means and methods, which involved unethical conduct and sharp dealing (*i.e.*, lying to passengers). Moreover, lying to passengers about tips violates the established standards in the transportation business.

163. Specifically, Uber intentionally and maliciously interfered with Plaintiff and Drivers' enjoyment of an expectancy of tips from passengers by intentionally misrepresenting that gratuity was included in the cost of its fares. Uber sought to harm drivers like Plaintiff in order to gain a competitive advantage over taxi services that make no representation about gratuities being included in the costs of their fares. But, in order to keep prices lower, Uber does not actually include a tip for its Drivers as part of the fare.

164. Uber has stated to customers, on its website and in marketing materials, that a gratuity is included in the total cost of the car service and that there is no need to tip the Driver.

165. For example, as recently as at least April of 2015, Uber has sent promotion emails to customers, declaring that "payment is automatically charged to a credit card on file, with tip included."

166. In addition, at various times, Uber's contracts with its customers have incorporated by reference the statements and representations made on its website

regarding pricing, which includes such statements as the "tip is included" in the fare.

167.   Beginning in January 2016, Uber's agreements with passengers included language specifying that Uber does not designate a portion of the fare as a tip and that any representation to the contrary is not intended to suggest otherwise. But agreements in 2015, 2014, and 2013 did not have this language.

168.   These deliberate, illegal misrepresentations significantly altered the business relationship between passengers and Drivers like Plaintiff regarding gratuities, effectively terminating the gratuity system.

169.   Were it not for Uber's misrepresentations regarding gratuities, riders would have left a tip for drivers as is customary in the car-service industry.

170.   Uber knew that this would be a benefit accruing to the Drivers at the time it discouraged tipping by telling passengers tipping is included in the fare and knew the interference was certain or substantially certain to occur as a result of the conduct. Uber intentionally interfered with that relationship for its own gain.

171.   Uber's conduct damaged Plaintiff and other drivers

## COUNT 4
## INTENTIONAL AND/OR NEGLIGENT MISREPRESENTATION
## (on behalf of the Indiana Common-Law Class)

172.   Plaintiff, on behalf of himself and the Class, repeats and realleges all preceding paragraphs as if fully set forth below.

173.   In August 2014, Uber represented to Plaintiff in an electronic communication that he would make $2,000 a week.

174. Uber had information regarding how much money it paid drivers and knew this wasn't true. Uber knew it would never pay Plaintiff this amount of money and never intended to pay Plaintiff this amount of money. It nonetheless made these misrepresentations to convince Plaintiff to drive for it.

175. This representation was material in that it directly affected Plaintiff's decision to driver for Uber. Uber made this representation to coax Plaintiff into driving for Uber and meant to guide Plaintiff in his decision to drive for Uber by giving him false information regarding how much money he would make.

176. Uber intentionally disseminated this payment information, which it knew was a flat-out lie.

177. Uber was at the very least reckless and careless in disseminating this payment information.

178. Plaintiff reasonably and justifiably relied on this representation in deciding to sign up for and drive for Uber. Indeed, since Uber had amassed a significant amount of data regarding the amount of money drivers would make, Plaintiff assumed that Uber was not lying to him and that Uber could be trusted. Moreover, Uber is Plaintiff's employer. If Uber said that Plaintiff would $2,000 per week, Plaintiff was reasonable in believing it.

179. But Plaintiff never made the money he was promised. Indeed, he usually did not even make minimum wage.

180. Lying to drivers about how much money they would make appears to have been a widespread practice for Uber. Indeed, Uber just entered into a

"Stipulated Order for Permanent Injunction and Monetary Judgment," attached as **Exhibit 1**, in an action brought by the Federal Trade Commission for the same conduct Plaintiff complains about. Uber agreed to pay $20,000,000 and to not make any more misrepresentations regarding the income a driver is likely to earn.

181.    Uber's conduct damages Plaintiff and the Class.

## COUNT 5
## PROMISSORY ESTOPPEL
## (on behalf of the Indiana Common-Law Class)

182.    Plaintiff, on behalf of himself and the Class, repeats and realleges all preceding paragraphs as if fully set forth below.

183.    In August 2014, Uber promised Plaintiff that he would make $2,000 a week.

184.    Uber had information regarding how much money it paid drivers and knew this was not true. Uber knew it would never pay Plaintiff this amount of money and never intended to pay Plaintiff this amount of money. It nonetheless made these promises to convince Plaintiff to drive for it.

185.    Uber knew and intended for Plaintiff to rely on this promise. This representation was material in that it directly affected Plaintiff's decision to drive for Uber. Uber made this representation to coax Plaintiff into driving for Uber and meant to guide Plaintiff in his decision to drive for Uber by giving him false information regarding how much money he would make.

186.     This promise regarding how much money Plaintiff would make is unrelated to the driver agreement, which does not address how much money Plaintiff would make.

187.     Uber intentionally disseminated this payment information, which it knew was a flat-out lie.

188.     Uber was at the very least reckless and careless in disseminating this payment information.

189.     Plaintiff reasonably and justifiably relied on this representation in deciding to sign up for and drive for Uber. Indeed, since Uber had amassed a significant amount of data regarding the amount of money drivers would make, Plaintiff assumed that Uber wasn't lying to him and that Uber could be trusted. Moreover, Uber is Plaintiff's employer. If Uber says that Plaintiff would make $2,000 per week, Plaintiff was reasonable in believing it.

190.     But Plaintiff never made the money he was promised. Indeed, he usually did not even make minimum wage.

191.     Lying to drivers about how much money they would make appears to have been a widespread practice for Uber. Indeed, Uber just entered into a "Stipulated Order for Permanent Injunction and Monetary Judgment," attached as **Exhibit 1**, in an action brought by the Federal Trade Commission for the same conduct Plaintiff complains about. Uber agreed to pay $20,000,000 and to not make any more misrepresentations regarding the income a driver is likely to earn.

192.     Uber's conduct damages Plaintiff and the Class.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the proposed Classes and Collective, requests relief against the Defendants as follows:

      a.      An award of damages, including compensatory, punitive, and treble damages, in an amount to be determined at trial;

      b.      Notice to the Classes and Collective of the action;

      c.      An injunction against Defendants prohibiting Defendants from engaging in each of the unlawful practices, policies, and patterns set forth herein;

      d.      Liquidated damages, pursuant to the Indiana Code and FLSA;

      e.      Declaratory relief that Plaintiff and members of the Classes and Collective are employees under the relevant law;

      f.      Reasonable attorneys' fees and costs of this action;

      g.      Pre-judgment and post-judgment interest as provided by law; and

      h.      Such other and further relief that the Court may deem just and proper.

## JURY DEMAND

Plaintiff, on behalf of himself and the proposed Classes and Collective, demands a trial by jury on all claims so triable.

March 8, 2017

Respectfully submitted,


s/ Vess A. Miller
Irwin B. Levin
Richard E. Shevitz
Vess A. Miller
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Tel. (317) 636-6481
Fax (317) 636-2593
rshevitz@cohenandmalad.com
vmiller@cohenandmalad.com


Paul B. Maslo (pro hac forthcoming)
Andrew J. Dressel (pro hac forthcoming)
NAPOLI SHKOLNIK PLLC
360 Lexington Avenue, Eleventh Floor
New York, NY 10017
Tel. (212) 397-1000
PMaslo@NapoliLaw.com
ADressel@NapoliLaw.com